SUPREME COURT.   New-York General Term, December, 1857.
*Mitchell, Davies* and *Clerke,* Justices.

## THE PEOPLE *v.* SAMUEL JACKSON.

Persons believing in any other than the Christian religion are required by statute (2 *R. S.,* 408) to be sworn according to the peculiar ceremonies of their religion.

A Jew, or Israelite, is usually sworn upon the Hebrew bible, and with his head covered.

Where, on a trial for larceny, the prosecutor, on his cross-examination by the prisoner's counsel, was asked if he had not said to one Emly that he " did not think the prisoner intended to do anything wrong, but wanted to climb too high," and answered that he did "not recollect it," and that he did "not know that he had said so;" and afterwards, on the trial, Emly was called as a witness for the prisoner and asked whether the prosecutor had ever said so to him, and the district attorney objected generally to the evidence, and it was excluded, such exclusion was held to be erroneous.

In such a case, the party making the objection cannot be permitted, on review, to avail himself of the position that the previous question was not sufficiently precise as to time and place, because the objection at the trial was not put on that ground.

J., by falsely representing to S. that he had sold for S. a quantity of goods to R. H. & Co., induced S. to send the goods to the store of R. H. & Co. J. then went to R. H. & Co., with whom he had had, in fact, no dealings on account of S., and informed them that the goods were sent there by mistake, and induced them, by such misrepresentation, to deliver the goods to him, and took them away from the store of R. H. & Co. and converted them to his own use, *held,* that this was larceny, and not simply obtaining goods by false pretences.

CERTIORARI to the Court of General Sessions of the peace in and for the city and county of New-York.

The prisoner was indicted for grand larceny, in stealing the goods of J. Scheuer, and pleaded not guilty. He was tried upon the indictment on the 17th day of November, 1856, before the recorder of said city and a jury.

The people, to maintain the issue on their part, called as a witness,

*Joseph Scheuer,* who, before being sworn, was asked by prisoner's counsel his religious faith, and answered that he was an Israelite, a Jew; upon being then asked by said

counsel whether there was not a form of oath more binding and obligatory upon persons of his religious faith, and so considered by them, than the usual form, replied that there was with some, but not with him ; that it was with a skein of silk about the arm, and other ceremonies, which he could not particularly state, but that the usual form was binding on his conscience.

The prisoner's counsel thereupon objected to the witness being sworn in the usual form, and insisted he should be sworn in the form considered most binding upon persons of his religious faith; but the court overruled the objection, and the witness was sworn in the usual form, upon the Hebrew bible, and covered; to which the prisoner's counsel excepted.

The witness then testified. I was an importer of goods in May, 1855 ; I knew Samuel Jackson then; in May, 1855, he called upon me in relation to some satins ; he said he had sold to Richards, Haight & Co., on my account, twenty pieces of satins and ten pieces of other goods, on nine months credit; there was a sale by me, founded upon what Jackson stated to me, to Richards, Haight & Co.; he gave me an account of sales to Richards, Haight & Co.; he did not say where the goods were to be delivered; these goods which Jackson spoke about were partly in my store; the satins were in the bonded warehouse; the satins were in a box marked J. S. & Co., 1040; I ordered my custom-house broker to pay duty and send the satin to Richards, Haight & Co.; I had not seen Richards, Haight & Co. then; prisoner asked me why I did not send him the goods, why I sent direct to Richards, Haight & Co? he said it seemed I had not perfect confidence in him, and it would put him in an awkward position with Richards, Haight & Co., as he had told them he had the goods consigned from a house in Boston, and he would stand like a liar before them ; this was after the goods had been sent; he has never given me any account of the satins ; he said he had taken all the goods to Haggerty,

Jones & Co.; prisoner said he got advances from them on the goods; prisoner was to bring me the note of Richards, Haight & Co. for the goods; as the note was not brought me by prisoner, I called on Richards, Haight & Co. for it; I inquired if they had given the note to prisoner; I did not get the note; I told Jackson the result of the interview; he did not deny that he had not made a sale; he never brought me a note for the goods; I saw the goods at Haggerty, Jones & Co. after that time; they were sent there without my knowledge; the sale of the goods was on the twenty-ninth of May; I called on Richards, Haight & Co. about the sixth of July for the notes.

*Cross-examined.* First knew the prisoner in April, 1855; I made an arrangement with him to sell goods for me at two and a half per cent commissions; I was to have control of the customers; prisoner brought me a list of his business acquaintances in Philadelphia; prisoner reported sales to me; after this to Richards, Haight & Co., and I delivered goods to Jackson himself; I directed the carman to take the satin to Richards, Haight & Co.; the prisoner being dissatisfied by my sending to them direct, at his request I allowed nine pieces of serge to go to Jackson himself; Jackson was to bring me the notes, or I could get them myself; a civil suit was commenced by me; I acted wholly under the advice of my counsel; I made a complaint against him December 8th, 1855; my civil claim he tried to settle with me; I commenced a civil suit in July, 1855.

Prisoner's counsel then offered to prove that a civil suit had been commenced by prosecutor against the prisoner, for other property, including these twenty pieces of silk, on 12th July, 1855, in New-York Common Pleas. That Jackson was arrested and held to bail; that no defence was put in, Jackson being then in Eldridge-street prison, and that when judgment was finally taken, it was taken, omitting these goods; that the judgment had been delayed until a

The People *v.* Jackson.

motion was made to compel the entry of judgment, and that meantime this indictment was obtained.

This offer was overruled, and the prisoner's counsel excepted.

District attorney admitted suit commenced July, 1855.

*Cross-examination resumed.* It might be that I said to Emly that I didn't think Jackson wanted to do anything wrong, but wanted to climb too high; but I don't recollect it; don't know that I said so; it was after Jackson was arrested; I sent some goods to other houses under this arrangement, by Kingsley's express.

*Direct, resumed.* I had six orders for goods from Jackson, to be sent to different parties.

*Question.* In any of those transactions, have you ever received the pay?

Objected to by defendant's counsel as irrelevant and improper, as Jackson could not be here tried for any other transaction.

Objection overruled, and exception by prisoner's counsel.

*Answer.* No sales have been made. They have all gone to Haggerty, Jones & Co., and he has received advances on them, and also advances from others upon them. The goods he pretended to sell were not sent to the persons he pretended to have sold to, but were appropriated by him except in those cases where he paid me.

The people then called *George Flagg,* who, being duly sworn, testified: I am one of the firm of Richards, Haight & Co.; in May, 1855, a box of satins was brought to our store; while that box was in our possession Samuel Jackson came in; I saw the inside of the box; it contained black satins; I saw at least one piece containing forty or fifty yards; should think its lowest value would be $1.50 per yard; I heard Jackson say that box was sent there by mistake; the box was taken away by Mr. Jackson; we delivered the box to him; at that date we did not have any business connection with Jackson in relation to that box of

satin, nor with Mr. Scheuer; the goods were received into our store and taken care of by our firm.

The people then called *Benjamin Taylor*, who, being duly sworn, testified: that he took the satins in question, by direction of Warren Carter, custom-house broker, to the store of Richards, Haight & Co., and delivered them there in May, 1855; and that Richards, Haight & Co. received the goods and gave a receipt for them; box was marked J. S. & Co., 1040.

The people then called *Warren Carter*, who, being duly sworn, testified: That he was a custom-house broker in May, 1855; and that by direction of Joseph Scheuer, the prosecutor, he sent by the witness, Taylor, the satins in question to Richards, Haight & Co., and that the prosecutor directed him to deliver the goods to Richards, Haight & Co.; the box was marked J. S. & Co., 1040.

The prisoner's counsel then called —— *Emly*, who, being duly sworn, was asked this question:

*Question.* Did Joseph Scheuer ever say to you that he did not believe the prisoner intended to do anything wrong, but was trying to climb too high?

The question was objected to by the district attorney, and excluded by the court, to which the prisoner's counsel excepted.

*Solomon Palmer*, being duly sworn for the people, gave evidence, showing that the satins in question were sent to the store of Haggerty, Jones & Co. in June, 1855 (auctioneers), and an advance made to the prisoner upon them.

On cross-examination, he testified to prisoner's good character, which the district attorney admitted to be good, irrespective of the circumstances of the case.

The testimony being closed, the prisoner's counsel requested the court to charge the jury:

First. That under the evidence the prisoner was entitled to a verdict of acquittal.

The People *v.* Jackson.

The court refused so to charge, to which refusal the prisoner's counsel excepted.

Second. That if the jury believed that the prosecutor intended to part with the property in the goods, the prisoner was entitled to an acquittal.

The court refused so to charge, to which refusal the prisoner's counsel excepted.

Third. That if the jury find that the prosecutor parted with the property, as well as the possession of the goods, the prisoner is entitled to an acquittal.

The court refused so to charge, to which refusal the counsel for the prisoner excepted.

Fourth. If the jury find that the prosecutor, at the time he delivered the goods to Richards, Haight & Co., intended to part with the property in as well as the possession of the goods, the jury must find a verdict for the prisoner.

The court refused so to charge, and the counsel for the prisoner excepted to such refusal.

The court thereupon charged the jury, that, if they found there was no sale of the goods to Richards, Haight & Co., the possession of the goods by them was the possession of the prosecutor, and the legal possession was in him.

To this the prisoner's counsel excepted.

(And if they so found, it was of no consequence whether the prosecutor intended to part with the property in the goods); and that to constitute a sale, there must be the act and consent of two parties, buyer and seller.

To this clause in parenthesis, the prisoner's counsel excepted.

The court further charged, that if the jury believed that the goods were taken by prisoner from the store of Richards, Haight & Co., with the intention of converting the same to his own use, and the statement to Scheuer was a device to get possession, and there was no sale to them; as a matter of law it was a larceny, and that in law the property was still in Scheuer.

To which the prisoner's counsel also excepted.

The prisoner's counsel also excepted to the charge, as far as it was contrary to the requests to charge, submitted by him.

The jury found the prisoner guilty, and a bill of exceptions was made and settled.

The following certificate was made by the recorder :

I decline to give a certificate of probable cause in this case, for the reason that I do not consider the exceptions to the ruling upon the evidence, or the exceptions to the charge of the court, well taken ; that the request to charge upon the question of the parting by the complainant with the possession and the property, does not apply to the facts in this case, for the reason that the evidence shows that the complainant did not part with the possession or property, the possession of Richards, Haight & Co. being the possession of the complainant, as no sale of the goods had been made.

JAMES M. SMITH, Jr.,
*Recorder of the City and County of New-York.*

After which, the following certificate was made by Judge Birdseye :

I certify that, in my opinion, there is probable cause for the within bill of exceptions, and so much doubt as to render it expedient to take the judgment of the Supreme Court upon the exceptions.

LUICIEN BIRDSEYE,
*Justice Supreme Court.*

New-York, November 19, 1856.

*H. R. Dyett,* for the prisoner.

*A. Oakey Hall* (District Attorney), for the people.

The People *v.* Jackson.

*By the Court,* MITCHELL, J.—Scheuer was an importer of goods, and arranged with Jackson to sell goods for him at a commission of two and a half per cent, Scheuer to have a control of the customers. Jackson represented to Scheuer that he had contracted to sell for him, to Richards, Haight & Co., twenty pieces of satin and ten pieces of other goods, and gave an account of the sales to Scheuer. Scheuer, who proves these facts, adds: " There was a sale by me, founded upon what Jackson stated, to Richards, Haight & Co." The satins were in the bonded warehouse, the other goods at Scheuer's store. Scheuer ordered the satins direct to the store of Richards, Haight & Co., and Jackson expressing the opinion that this showed a distrust of him, Scheuer allowed nine pieces of the goods to go from his store to Jackson. Jackson was to bring notes for the amount to Scheuer, but did not do so. He never rendered any account of the satins. He admitted that he took the goods which he received to Haggerty, Jones & Co., and obtained an advance upon them. The same witness proved that he had six orders from Jackson for goods to be sent to other persons, and was allowed to testify that he had never been paid for those goods; that they were not sent to the persons to whom he pretended they were sold, but had gone to Haggerty, Jones & Co., from whom Jackson had received advances on them, except in cases where Jackson had paid him. It was shown that the pieces of satin were sent from the bonded warehouse, by order of Scheuer, to Richards, Haight & Co., and that then Jackson came there and said the box was sent them by mistake and took it away, and that they had no business relations with Scheuer. Jackson then took the goods to Haggerty, Jones & Co., and obtained an advance upon them.

The court was requested to charge that if Scheuer intended to part with the property in the goods, the prisoner was entitled to an acquittal, but refused; also, to charge that if the prosecutor, when he delivered the goods to

Richards, Haight & Co., intended to part with the property, as well as the possession of the goods, the jury must find for the prisoner, but the court again refused.

The court charged that, if there was no sale to Richards, Haight & Co., it was of no consequence whether the prosecutor intended to part with the property in the goods or not.

The recorder, in his certificate, states that he made these rulings because the evidence showed that the complainant did not part with the possession or property, and so the question of law implied in the request did not arise. The question was submitted to the jury, whether the prisoner made the representation to Scheuer as a device to get possession of the goods, and then took them from Richards, Haight & Co., with the intention of converting them to his own use.

The prosecutor testified that he might have said to Emly that he did not think Jackson would do anything wrong, but wanted to climb too high; but he did not recollect it, and did not know that he said so.

The prisoner asked Emly if Scheuer had ever said so to him, and the question was excluded.

It does not appear that any objection was taken to the question on account of the previous question to the prosecutor not being sufficiently precise as to time and place; otherwise the question was proper, as it tended to discredit the prosecutor. He had negatived the idea of his having made this statement by the mode of his answering. If he had answered that he had said so, as it must be assumed Emly would have testified, then the jury would have had before them the inconsistency of his prosecuting a man for stealing, while he had declared that he did not believe the man intended any wrong. The statement, or his evidence, would require some explanation, and might have led to his discredit with the jury, or to have made them believe that the prisoner did not make the representations to Scheuer with a view to get the goods from Haight and convert them

The People *v.* Jackson.

to his own use. It might be entitled to extremely little weight, but it was entitled to some.

If Jackson had bought the goods of Scheuer under these false pretences, he would have been liable only for the false pretence; there would then have been an intention to pass the title of the possessor to the person to whom they did pass. The goods could not be said to have been feloniously taken from the owner, when they had been voluntarily delivered by him, with the intention of passing the title, although he was induced to do so by a false statement. But if he was led by the false pretence merely to send the goods to Richards, Haight & Co,, where they still remained as his, because Richards, Haight & Co. did not mean to buy them and had never agreed to buy them, then, when the goods were taken from the latter they were taken without any assent of the owner, and from a possession of one whose possession was the same as that of the true owner. The false pretence did not lead to the delivery of the goods to the prisoner, but to the delivery of them to Richards, Haight & Co. It had exhausted its delusive effect when that was accomplished, and when the defendant took the goods from them he did so by an additional deception, in which the deceived party had no intention to pass the property.

It was proved that the prisoner's character was good, and it was admitted that it had been so, except in these transactions. If his understanding of his offence is rendered more acute it may not be a cause of regret to reverse the judgment.

The conviction must be reversed and a new trial granted.